UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED SPECIALTY INSURANCE COMPANY, | CASE NO. C18-0596JLR |
| Plaintiff, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| SHOT SHAKERS, INC., et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court are (1) Plaintiff United Specialty Insurance Company's ("USIC") motion for partial summary judgment (USIC MPSJ (Dkt. # 24)); and (2) Defendants Shot Shakers, Inc., Scott Simpson, and Michelle Simpson's (collectively, "Shot Shakers" or "Defendants") motion for partial summary judgment (Def. MPSJ (Dkt. # 27)).  The parties filed opposition and reply briefs to the cross-motions.  (*See* USIC Resp. (Dkt. # 30); Def. Resp. (Dkt. # 33); USIC Reply (Dkt. # 37); Def. Reply (Dkt. # 38).)  In

addition, USIC filed a surreply moving to strike portions of Shot Shakers' reply brief. (*See* Surreply (Dkt. # 42); *see also* Def. Reply.) The court has considered the parties' submissions in support of and in opposition to the cross-motions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS in part and DENIES in part USIC's motion to strike, GRANTS in part and DENIES in part Shot Shakers' motion for partial summary judgment, and GRANTS in part and DENIES in part USIC's motion for partial summary judgment. The court also ORDERS the parties to file a joint status report within 14 days of the date of this order identifying any claims remaining for trial in light of the court's rulings on the cross-motions.

## II. BACKGROUND

This is an insurance coverage dispute. (*See* Compl. (Dkt. # 1); Answer (Dkt. # 14).) The parties contest whether, under the terms of the operative insurance policy and Washington law, USIC is obligated to cover the loss that Shot Shakers incurred as the result of a fire at its restaurant. (*See generally id.*) USIC filed a declaratory judgment

---

[1] USIC requests oral argument on the motions. (*See* USIC MPSJ at 1; USIC Resp. at 1.) The court, however, determines that these motions are appropriate for decision without oral argument. The general rule is that the court may not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied. *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964). Further, oral argument is not required if the party requesting oral argument suffers no prejudice. *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984). Here, USIC is not prejudiced by a denial of oral argument on the motions because the court is denying Shot Shakers' motion as it relates to USIC's preferred relief, as well as granting USIC's motion on its preferred relief. *See infra* §§ III.D, III.E. Moreover, Shot Shakers has not requested oral argument on USIC's motion. (*See* Def. MPSJ at 1; Def. Resp. at 1.) Federal Rule of Civil Procedure 56 does not require a hearing where the opposing party does not request it. *See, e.g.*, *Demarest v. United States*, 718 F.2d 964, 968 (9th Cir. 1983). The issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court. *See* Local Rules W.D. Wash. LCR 7(b)(4). The court finds that USIC is not prejudiced by the denial of oral argument in this case.

action seeking guidance on its obligations under the policy and requesting rescission of the insurance contract. (*See generally* Compl.) Shot Shakers filed counterclaims against USIC, seeking declaratory judgment that its loss is covered by the insurance policy, and alleging breach of contract, bad faith, and violations of the Insurance Fair Conduct Act, RCW 48.30.015, and the Consumer Protection Act, chapter 19.84 RCW. (*See* Answer at 8-11.) The cross-motions focus on the parties' declaratory judgment actions and USIC's request for rescission. (*See* USIC MPSJ at 12; Def. MPSJ at 3.)

**A.     The Insurance Applications**

On July 3, 2014, Shot Shakers submitted an insurance application to Anchor Bay Insurance Managers, Inc. ("Anchor Bay"), requesting insurance for its restaurant, the Roosevelt Ale House. (USIC MPSJ at 2-3; Compl. ¶ 16, Ex. B ("2014 Application").) Anchor Bay is USIC's agent. (USIC MPSJ at 2; *See generally* Harris Decl. (Dkt. # 26), ¶ 12, Ex. 11 ("Dement Dep.").) In its insurance application, Shot Shakers made the following representations:

> [I]s there [an Underwriters Laboratories] approved auto extinguishing system over ALL cooking surfaces and deep fryers (other than self contained units described above)? <u>Yes</u> . . .

> Is there a semi-annual (or more frequent) service contract on the automatic extinguishing system? <u>Yes</u>

> Are hoods and ducts equipped with filters? <u>Yes</u>

> Are filters cleaned at least every 6 months? <u>Yes</u>

> Are hoods and ducts cleaned every 6 months or more frequently? <u>Yes</u> . . .

> Are there any uncorrected fire code violations? <u>No</u>

(2014 Application at 3.)

After receiving Shot Shakers' application, Anchor Bay issued a USIC commercial lines insurance policy to Shot Shakers with effective dates of July 4, 2014, through July 4, 2015. (*Id* at 2; USIC MPSJ at 4.) Shot Shakers renewed this insurance policy annually by submitting new applications. (*See* Harris Decl. ¶ 2, Ex. 1 ("2015-17 Applications").) At least in the 2016 and 2017 applications, Shot Shakers made the same representations about its automatic fire extinguishing system, hoods and ducts, and lack of fire code violations as stated above. (*See* 2015-17 Applications at 5, 10.) The 2017 application resulted in Shot Shakers receiving insurance coverage from July 4, 2017, through July 4, 2018. (*See id.* at 9.)

**B.      The Insurance Policy**

The insurance policy at issue is USIC Commercial Lines Policy No. USA 4174990 with effective dates of July 4, 2017, through July 4, 2018 ("the Policy"). (Compl. ¶ 8, Ex. A ("Policy") at 3.) The Policy applies to Shot Shakers' restaurant, the Roosevelt Ale House, at 12030 22nd Ave NE, Seattle, Washington 98125 ("the Property"). (*Id.*) The Policy covers "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (*Id.* at 72.) A Covered Cause of Loss "means direct physical loss unless the loss is excluded or limited in this policy." (*Id.* at 122.)

The Policy contains a Protective Safeguards Endorsement. (*Id.* at 135-39.) The Protective Safeguards Endorsement contains a "Schedule," which requires a "[f]ully functional and actively engaged fire extinguishing system over the entire cooking area

with an automatic shut off for the heat source with a semi annual service contract." (*Id.* at 135.) The Protective Safeguards Endorsement explains that "[a]s a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above" ("the Safeguards Condition"). (*Id.*) The Protective Safeguards Endorsement also excludes coverage under certain circumstances:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:
>
> 1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
>
> 2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order

("the Safeguards Exclusion"). (*Id.* at 136.)

The Policy contains an additional endorsement under its Commercial Property Conditions section, which excludes coverage for concealment, misrepresentation, or fraud. (*Id.* at 97.) According to the Policy:

> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> 1. This Coverage Part;
>
> 2. The Covered Property;
>
> 3. Your interest in the Covered Property; or
>
> 4. A claim under this Coverage Part

//

//

("the Concealment, Misrepresentation, or Fraud Condition"). (*Id.*) Covered Property includes "[f]ire-extinguishing equipment" and "[a]ppliances used for . . . ventilating." (*Id.* at 72.)

**C.     The December 16, 2017, Fire**

At approximately 2:45 a.m. on December 16, 2017, a fire was discovered at the Roosevelt Ale House ("the fire"). (Compl. ¶ 19; Answer ¶ 19.) Mr. Simpson learned about the fire after his alarm company called at around 2:40 a.m. to alert him that a motion sensor had triggered within the restaurant. (Harris Decl. ¶ 6, Ex. 5 ("Simpson Interview") at 3.) Because no external alarm activated, Mr. Simpson believed, based on experience, that the internal sensor was triggered by a rat. (*Id.* at 3-4.) Mr. Simpson drove to the restaurant expecting to simply turn off the alarm. (*Id.* at 3.) Upon arrival, however, Mr. Simpson opened the backdoor and saw black smoke from floor to ceiling. (Harris Decl. ¶ 3, Ex. 2 ("SFD Report") at 2.) Mr. Simpson then called 9-1-1. (*Id.*)

The Seattle Fire Department arrived shortly thereafter. (*See generally id.*) After extinguishing the fire, the Fire Department determined that the fire occurred because "[t]he right burner to the 'steakhouse' broiler was left in the 'ON/HIGH' position." (*Id.* at 13.) This broiler was added to the restaurant's kitchen in the year before March 2015. (*See* Deschenes Decl. (Dkt. # 25) ¶ 4.) According to the Fire Department, "[t]he heat from the hot griddle surface . . . overheated nearby combustibles to their ignition temperatures. The first fuel ignited was most likely the accumulation of grease in the overhead range system." (SFD Report at 13.) The Fire Department noted that the hood

//

directly over the broiler where the fire began had "no suppression system nozzles overhead." (*Id.* at 12.)

**D.  Investigation**

USIC retained licensed fire investigator Ed Iskra to investigate the fire. (*See* Harris Decl. ¶¶ 4-5, Ex. 3 ("Retention Letter"), Ex. 4 ("Iskra Report").)  Similar to the Fire Department, Mr. Iskra concluded that "[t]he fire originated at the steakhouse broiler/griddle," which was left on after the restaurant closed. (Iskra Report at 14.)  Mr. Iskra also noted that there was "no suppression protection nozzle covering the steakhouse broiler." (*Id.* at 12; *see also id.* at 11.)  Mr. Iskra concluded:

> The heat produced by the burner . . . liquefied the excessive amount of grease within the hood.  Dripping grease contacted the hot, top side griddle of the appliance, igniting the grease.  The dripping grease was the first fuel ignited.  Sustained combustion of the grease spread throughout the hood exhaust system and overwhelming the fire suppression system; the fire continued burning and communicated throughout the kitchen area. . . .

> The lack of frequent cleaning of the hood baffle filters by employees, the lack of regular scheduled professional cleaning of the entire hood system, the failure to upgrade the hood fire suppression system as recommended by the fire suppression service provider, and the failure of employees to confirm that all burners of cook line appliances were off after closing the establishment are all factors that caused the uncontrolled grease fire.

(*Id.* at 14.)  Mr. Iskra clarified, however, that even had Shot Shakers appropriately installed and positioned protection nozzles over the broiler, the fire suppression system "would not have been effective at stopping the spread of the fire due to excessive grease accumulations in the filters, hood and ductwork of the grease-laden" hood. (*Id.* at 5.)

Mr. Iskra interviewed Mr. Simpson as part of his investigation. (*See generally* Simpson Interview.)  In that interview, Mr. Simpson told Mr. Iskra that he serviced his

fire suppression system "once a year."  (*Id.* at 5; *but see* Simpson Decl. (Dkt. # 28) ¶ 11

(Mr. Simpson claiming that Shot Shakers "had an arrangement / agreement with

AAA . . . to have the fire extinguishing system serviced and cleaned on a six month

basis").)  Mr. Simpson also told Mr. Iskra that his hoods and ducts were cleaned "[e]very

six months."  (Simpson Interview at 5-6; Simpson Decl. ¶ 11.)  Mr. Simpson explained

that he becomes aware that his fire suppression system and his hoods and ducts need

maintenance when the maintenance companies call to alert him that he is due for an

appointment.  (*Id.*)

        Service records from AAA Fire Protection, Inc. ("AAA"), the company that

maintains Shot Shakers' fire suppression system, support Mr. Simpson's representation

that he services his fire suppression system once a year.  (*See* Compl. ¶¶ 31-33, Ex. C

("AAA 2015 Report"), Ex. D ("AAA 2016 Report"), Ex. E ("AAA 2017 Report").)

AAA performed maintenance on Shot Shakers' fire suppression system on March 12,

2015, March 25, 2016, and January 6, 2017.  (*See id.*)  At every service, AAA provided a

Confidence Test Report.  (*Id.*)  Each Confidence Test Report noted that Shot Shakers'

cooking appliances did not have the required number and type of nozzles to provide

adequate fire protection and that the nozzles were not properly positioned.  (*See* AAA

2015 Report at 3; AAA 2016 Report at 3; AAA 2017 Report at 3.)  The reports further

specified the deficiencies.  The 2015 report stated that "[a]ppliances [were]

added/removed and nozzles don't line up and aren't correct."  (AAA 2015 Report at 5.)

The 2016 report said:  "Nozzles not right.  Not all appliances are protected.  Nozzles not

within specs."  (AAA 2016 Report at 5.)  And the 2017 report—the most recent one

before the fire—said: "Not all appliances are protected and nozzles not right. Not enough detection and slow due to grease. Cylinder due for 6 year." (AAA 2017 Report at 5.) The 2017 report also explained that the fusible link line was impaired by grease and that the fire suppression system did not have an adequate supply of extinguishing agent to completely cover the cooking appliances. (*Id.* at 3.) All of the reports listed the codes and rules under which the inspections were being performed. (*See, e.g.*, *id.* ("Refer to **2009 Seattle Fire Code (SFC) Sec. 202, 602, 609, 904.11-904.11.6.3; SFC Administrative Rule 9.02.09; and 2002 NFPA 17, 2002 NFPA 17A, and 2008 NFPA 96** for inspecting and testing requirements.").)

AAA provided Shot Shakers with two quotes to correct the fire suppression system's noted deficiencies. (*See* Harris Decl. ¶¶ 8-9, Ex. 7 ("2016 Quote"), Ex. 8 ("2017 Quote").) On March 25, 2016, AAA quoted Shot Shakers $750.00 to "re-pipe the cook-line to meet current cooking line up" and to "remove and re-pipe the fire suppression system to meet manufactures [sic] specs" because "[n]ot all appliances are protected and nozzles not correct." (2016 Quote at 2.) AAA explained that these repairs are "required by the manufacture [sic], state and local codes." (*Id.*) Similarly, on January 20, 2017, AAA quoted Shot Shakers $2,281.66, in part to fix unprotected appliances that were "added to cook line and have **NO** or **WRONG** surface protection." (2017 Quote at 2.) Mr. Simpson claims that on July 14, 2017, Shot Shakers paid AAA a down payment to upgrade the fire extinguishing system. (Simpson Supp. Decl. (Dkt. # 39) ¶ 4.) The parties agree that AAA's recommended repairs were not made prior to the December 16, 2017, fire. (*See id.*; Deschenes Decl. ¶¶ 6-8.)

In addition, Shot Shakers hired Northwest Kitchen Exhaust to maintain its kitchen hoods, ducts, and filters. (*See* Harris Decl. ¶ 10, Ex. 9; Compl. ¶ 35, Ex. F ("Nw Kitchen Reports") at 2-6; Simpson Decl. ¶ 11.) Northwest Kitchen Exhaust serviced Shot Shakers' hoods, ducts, and filters on December 3, 2014, April 2, 2015, November 12, 2015, July 28, 2016, January 19, 2017, and May 17, 2017. (*See* Harris Decl. ¶ 10, Ex. 9; Nw Kitchen Reports.) Prior to the fire, Northwest Kitchen Exhaust had not cleaned Shot Shakers hoods, ducts, and filters for almost seven months. (*See* Nw Kitchen Reports at 2.) Although earlier service reports by Northwest Kitchen Exhaust noted that Shot Shakers' filters needed "more frequent cleaning" (*see id.* at 4-5; Harris Decl. ¶ 10, Ex. 9 at 5 (December 3, 2014, report noting that frequency of cleaning was "poor")), the five most recent reports stated that Shot Shakers' frequency of cleaning service was "[a]dequate" (*id.* at 2-3).

In addition to Mr. Iskra, USIC retained a professional engineer, Adam Farnham, to inspect the Property after the fire. (*See* Harris Decl. ¶ 11, Ex. 10 ("Farnham Report").) Mr. Farnham noted that Shot Shakers' hoods and ducts were "cleaned every six months," and that the "fire suppression system [was] serviced annually." (*Id.* at 4.) Further, Mr. Farnham explained that, although the "broiler oven was installed approximately a year before the fire . . . [,] nozzles had not been altered in the area of the broiler oven [and a]s a result, it did not have suppression system coverage." (*Id.*) Mr. Farnham also focused on the grease in Shot Shakers' hood, ducts, and filters:

> Grease accumulations were excessive. Grease trays and collection points were full, both in the hood and cooking appliances. A heavy layer of char was noted on the grease filters and in the hood and ductwork. This char was

a result of the combustion of grease in the hood and ductwork. With such a heavy combustible load, it is unlikely that even a perfectly configured suppression system could have extinguished the fire.

Nozzle and agent provisions in the hood and ductwork were in accordance with manufacturer's specifications. NFPA 96 recommends a maximum grease deposit thickness of 0.078 inches. Deposits in the hood and ductwork were several times greater than this recommended limit. Had the appliances and hood and ductwork been cleaned to code requirements, the fuel load would have been minimized and a developing fire, even with the imperfectly-configured fire suppression system, would have been controllable.

(*Id.* at 8-9.) Similar to Mr. Iskra, Mr. Farnham concluded that Shot Shakers' "fire suppression system, which was not properly configured for the appliances in the cookline, failed to control the fire," but that even "[a] properly configured fire suppression system would not have been able to control the fire due to an excessive combustible grease load presented in the appliances, hood and ductwork." (*Id.* at 9.)

**E.    Cross-Motions**

The parties filed cross-motions for partial summary judgment. (*See* USIC MPSJ; Def. MPSJ.) Both motions focus on three main issues: (1) whether the Protective Safeguards Endorsement in the Policy precludes coverage for the fire; (2) whether the Concealment, Misrepresentation, or Fraud Condition in the Policy precludes coverage for the fire; and (3) whether USIC is entitled to rescind the Policy based on concealment or misrepresentation. (*See* USIC MPSJ at 12; Def. MPSJ at 3.) In addition, the motions and responsive briefing request various other relief: (1) Shot Shakers seeks summary judgment on all of USIC's "coverage-related affirmative defenses" (*see* Def. MPSJ at 21); and (2) USIC requests that the court strike all "irrelevant 'facts'" that Shot Shakers included in its motion (USIC Resp. at 18). USIC also filed a surreply moving to strike

portions of Shot Shakers' reply. (*See* Surreply; *see also* Def. Reply.)  The court will first address USIC's surreply and request to strike all irrelevant facts, and then will address the issues the parties present for partial summary judgment.

### III.  ANALYSIS

**A.  Preliminary Matters**

    1. Surreply

USIC filed a surreply requesting that the court strike arguments raised in Shot Shaker's reply and the corresponding supplemental declarations. (*See* Surreply at 2-4.) USIC argues that the reply and supplemental declarations present impermissible new arguments and new evidence, thus depriving USIC the opportunity to substantively respond. (*Id.*); *see also* Local Rules W.D. Wash. LCR(7)(b)(1).

The Local Civil Rules limit the filing of a surreply. *See* Local Rules W.D. Wash. LCR 7(g).  A party "may file a surreply requesting that the court strike" "material contained in or attached to a reply brief." *Id.*  The surreply "shall be strictly limited to addressing the request to strike," and "[e]xtraneous argument or a surreply filed for any other reason will not be considered." *Id.* LCR 7(g)(2).

"It is not acceptable legal practice to present new evidence or new argument in a reply brief." *Roth v. BASF Corp.*, C07-0106MJP, 2008 WL 2148803, at *3 (W.D. Wash. May 21, 2008); *see also United States v. Puerta*, 982 F.2d 1297, 1300 n.1 (9th Cir. 1992) ("New arguments may not be introduced in a reply brief."); *Bridgham-Morrison v. Nat'l Gen. Assembly Co.*, C15-0927RAJ, 2015 WL 12712762, at *2 (W.D. Wash. Nov. 16, 2015) ("For obvious reasons, new arguments and evidence presented for the first time on

Reply . . . are generally waived or ignored.").  Additional evidence can be presented in support of a reply brief, however, where "[t]he Reply Brief addressed the same set of facts supplied in [respondent's] opposition to the motion but provides the full context to [respondent's] recitation of the facts." *Terrell v. Contra Costa Cty.*, 232 F. App'x 626, 629 n.2 (9th Cir. 2007).  In other words, "[e]vidence submitted in direct response to evidence raised in the opposition is not 'new.'" *Crossfit, Inc. v. Nat'l Strength & Conditioning Ass'n*, Case No. 14-CV-1191 JLS (KSC), 2017 WL 4700070, at *3 n.3 (S.D. Cal. Oct. 19, 2017).  The Local Civil Rules expressly contemplate submitting additional evidence with a reply brief.  *See* Local Rules W.D. Wash. LCR 7(b)(3) ("The moving party may . . . file . . . a reply brief in support of the motion, together with any supporting material of the type described in subsection (1).").

USIC moves to strike the following arguments and evidence that it claims is "new":  (1) Shot Shakers' argument that its insurance applications—which USIC relies on to claim that Shot Shakers made material misrepresentations (*see, e.g.*, Compl. ¶¶ 48-55)—are inadmissible under Washington law, RCW 48.18.080, because the applications were not attached to or incorporated by reference into the insurance policies (*see* Surreply at 2-3; Def. Reply at 11, 13); (2) the supplemental declaration and exhibits of Shot Shakers' attorney, Jason Donovan, which attaches Shot Shakers' USIC insurance policies from 2014 through 2018 in order to show the absence of Shot Shakers' insurance applications (*see* Surreply at 3; Donovan 2d Supp. Decl. (Dkt. # 40)); (3) Shot Shakers' argument that any alleged misrepresentations in its applications must be immaterial because Anchor Bay inspected the Property in 2014 and 2017 and still chose to grant

insurance coverage (*see* Surreply at 3; Def. Reply at 12, 14); and (4) all substantive portions of Mr. Simpson's supplemental declaration (*see* Surreply at 3-4; Simpson Supp. Decl.). The court grants USIC's request to strike with respect to the first, second, and third items, but denies the request to strike with respect to the fourth item.

Shot Shakers' arguments about the insurance applications' admissibility, as well as the materiality of any alleged misrepresentations to Anchor Bay, are inappropriate new argument. Shot Shakers raised these arguments for the first time in its reply brief. *See Roth*, 2008 WL 2148803, at *3; *see also T-Mobile USA Inc. v. Selective Ins. Co. of Am.*, C15-1739JLR, 2017 WL 2774070, at *6 (W.D. Wash. June 27, 2017). Shot Shakers did not make, or even hint at, these argument in its motion for partial summary judgment even though Shot Shakers knew that at least one of USIC's claims relied on the applications and the representations made therein. (*See generally* Def. MPSJ (not mentioning "Anchor Bay" or "application"); *see also* Compl. ¶¶ 48-55.) Likewise, the court strikes Mr. Donovan's supplemental declaration and attached exhibits that Shot Shakers provided to support its new arguments. (Donovan 2d Supp. Decl.) Even though additional evidence can be presented with a reply brief if it is in "direct response to evidence raised in the opposition," *Crossfit*, 2017 WL 4700070, at *3 n.3, Mr. Donovan's supplemental declaration does not fit this category. Rather, as Shot Shakers makes clear in its reply, Mr. Donovan's declaration and the exhibits attached thereto are in response to arguments raised in USIC's motion for partial summary judgment, rather than USIC's opposition. (*See id.* at 11 n.24 (citing to USIC's MPSJ).) Because Mr. Donovan's supplemental declaration is not in "direct response" to USIC's opposition, it is improper

new evidence.  *See Terrell*, 232 F. App'x at 629 n.2; *Crossfit*, 2017 WL 4700070, at *3 n.3; *see also Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (directing the court to "rule on each party's motion on an individual and separate basis"). The court therefore GRANTS USIC's request to strike sections D.1, D.3, E.2, and E.4 of Shot Shakers' reply (*id.* at 11-14), as well as Mr. Donovan's supplemental declaration and attached exhibits (Donovan 2d Supp. Decl.).

However, Mr. Simpson's supplemental declaration, which relates to alleged inspections of the Property, maintenance of the Property, and knowledge about his insurance applications, is admissible.  (*See* Simpson Supp. Decl.)  USIC's opposition raised all of these issues in some form, and Mr. Simpson's supplemental declaration is in "direct response" to USIC's opposition.  (*See* USIC Resp. at 3-7, 15-16.)  USIC also asks the court to strike Mr. Simpson's supplemental declaration because it is "self-serving" and "unsupported by any evidence."  (Surreply at 4.)  But even if Mr. Simpson's supplemental declaration is "uncorroborated and self-serving," this goes to weight and not admissibility.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (explaining that "uncorroborated and self-serving" testimony without other evidence may not create a genuine issue of material fact).  The court therefore DENIES USIC's request to strike Mr. Simpson's supplemental declaration.

2.  Motion to Strike Irrelevant Facts

USIC asks the court to strike all "irrelevant 'facts'" that Shot Shakers included in its motion for partial summary judgment that do not relate to the three coverage-related items at issue.  (*See* USIC Resp. at 18.)  "Factual disputes that are irrelevant or

unnecessary" to the claims at issue "will not be counted" when the court considers granting summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ("Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."). But that does not mean that irrelevant facts must be stricken from a summary judgment motion. *Compare* Fed. R. Civ. P. 56 (no section on striking "irrelevant" portions of summary judgment motion), *with* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."). Any irrelevant facts will remain simply that— irrelevant—and will not influence the court's consideration of the motions' merits. USIC's request is DENIED.

**B.    Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson*, 477 U.S. at 248. A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S.

at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the ultimate burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Conclusory allegations unsupported by factual data

cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003). Nor can a party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes*, 783 F.3d at 1156 (quoting *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)). The court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes*, 783 F.3d at 1156 (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998)); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) ("We evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." (citations and internal quotation marks omitted)).

## C.    Washington Insurance Law

Courts construe insurance policies as contracts. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000). Washington follows the objective theory of contracts, which focuses on the objective manifestations of the agreement. *Hearst Comm'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). Thus, in interpreting a contract, the court will "attempt to determine the parties' intent by focusing

on the objective manifestations of the agreement, rather than the unexpressed subjective

intent of the parties." *Id.*

Under Washington law, interpretation of an insurance policy is a question of law

for the court. *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). The court

should give the terms of the policy a "fair, reasonable, and sensible construction as would

be given to the contract by the average person purchasing insurance." *Id.* (internal

quotation omitted). When interpreting a policy's language, "the insurance contract must

be viewed in its entirety; a phrase cannot be interpreted in isolation." *Allstate Ins. Co. v.*

*Peasley*, 932 P.2d 1244, 1246 (Wash. 1997) (citing *Hess v. N. Pac. Ins. Co.*, 859 P.2d

586, 589 (Wash. 1993)). Terms defined within a policy are construed as defined;

undefined terms are given their ordinary meaning "as set forth in standard English

language dictionaries." *Overton*, 38 P.3d at 327 (citing *Boeing Co. v. Aetna Cas. & Sur.*

*Co.*, 784 P.2d 507, 511 (Wash. 1990)). If the policy language on its face is fairly

susceptible to two different and reasonable interpretations, then ambiguity exists, and the

court must apply the interpretation most favorable to the insured. *Peasley*, 932 P.2d at

1246-47.

The court follows a two-step process in determining whether an insurance policy

covers an insured's claim. *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000,

1004-05 (Wash. 1992); *Diamaco, Inc. v. Aetna Cas. & Sur.*, 983 P.2d 707 (Wash. Ct.

App. 1999). First, the court determines whether the insured has established that his or her

claim triggers coverage. *McDonald*, 837 P.2d at 1004-05. Second, if coverage is

//

1   triggered, the court determines whether the insurer has established that its policy contains

2   an exclusion barring the claim. *Id.*

3   **D.    Shot Shakers' Motion**

4          Pursuant to this two-step process, Shot Shakers argues that, at step one, the fire

5   triggered coverage under the Policy because Shot Shakers suffered a "direct physical loss

6   of or damage to Covered Property at the premises described in the Declarations caused by

7   or resulting from any Covered Cause of Loss." (*See* Def. MPSJ at 3, 15; Policy at 72;

8   *McDonald*, 837 P.2d at 1004-05. USIC does not contest that the basic coverage grant

9   was triggered. (*See generally* USIC Resp.)

10         Moving to step two, Shot Shakers argues that no Policy exclusion bars its claim.

11  (*See* Def. MPSJ at 3, 16-21.) Specifically, Shot Shakers claims that (1) USIC cannot

12  satisfy its burden of showing that the Policy's Protective Safeguards Endorsement

13  precludes coverage for the fire; (2) USIC cannot satisfy its burden of showing that the

14  Policy's Concealment, Misrepresentation, or Fraud Condition precludes coverage for the

15  fire; and (3) USIC cannot satisfy its burden that it is entitled to rescind the Policy. (*See*

16  *id.*) Viewing the evidence in USIC's favor, the court concludes that Shot Shakers is not

17  entitled to summary judgment on items one and two, but that it is entitled to summary

18  judgment on item three. Accordingly, the court GRANTS in part and DENIES in part

19  Shot Shakers' motion for partial summary judgment.

20  //

21  //

22  //

1      1.  Protective Safeguards Endorsement

2          The Protective Safeguards Endorsement contains both the Safeguards Condition

3   and the Safeguards Exclusion.  *See supra* § II.B.  The court addresses these clauses

4   separately.

5          *a.  The Protective Safeguards Endorsement Condition*

6          The Safeguards Condition explains that, "[a]s a condition of this insurance, you

7   are required to maintain the protective devices or services listed in the Schedule."

8   (Policy at 135.)  The Schedule requires a "[f]ully functional and actively engaged fire

9   extinguishing system over the entire cooking area with an automatic shut off for the heat

10  source with a semi annual service contract."  (*Id.*)

11         Shot Shakers parses the Safeguards Condition to argue that its fire suppression

12  system satisfied the Safeguards Condition and that USIC cannot carry its burden of

13  proving otherwise.  (Def. MPSJ at 16-19.)  The only terms of the Safeguards Condition

14  that the parties dispute are "fully functional" and "over the entire cooking area."  (*Id.*;

15  USIC Resp. at 12-14.)[2]  According to Shot Shakers, its fire suppression system was

16  "fully functional" because it activated and performed during the fire.  (Def. MPSJ at 16-

17  17.)  Moreover, Shot Shakers claims that its system was "over the entire cooking area"

18  because, even though nozzles did not cover the broiler, parts of the fire suppression

19  system extended over the entire cooking area.  (*Id.* at 17-18 ("[T]he fire suppression

20  cylinder and activation control box beyond the left (east) end of the cooking area was

21

22         [2] The parties also dispute whether Shot Shakers had a "semi annual service contract," but
        they do not dispute the meaning of those terms.  (*See* Def. MPSJ at 18-19; USIC Resp. at 14.)

continuously connected to pipes and nozzles which extended to the far right (west) end of the cooking area.").)

In response, USIC argues that Shot Shakers' fire suppression was not "fully functional" because it lacked nozzles covering the broiler where the fire started. (USIC Resp. at 13.) USIC likewise contends that the fire suppression system was not "over the entire cooking area" because nozzles did not cover some cooking surfaces. (*Id.* at 13-14.)

These terms are not defined in the Policy so the court gives them their plain, ordinary meaning. *Overton*, 38 P.3d at 327. The court defines the contested terms as follows:

- "Fully" means "in a full manner or degree";
- "Functional" means "performing or able to perform a regular function";
- "Over" means that something is in "a position higher than or above another"; and
- "Entire" means "having no element or part left out" and "complete in degree".

*See* Merriam-Webster's Collegiate Dictionary (11th ed. 2018). The court also interprets the Policy's language by viewing the Policy "in its entirety," rather than interpreting words or phrases "in isolation." *Peasley*, 932 P.2d at 1246. Utilizing these definitions and reading these terms in the context of the entire Policy, the court concludes that Shot Shakers has not shown an absence of disputed material fact that its fire suppression system satisfied the Safeguards Condition.

As a matter of law, Shot Shakers' interpretation of the Safeguards Condition is not reasonable. *See Overton*, 38 P.3d at 325. Under Shot Shakers' reading, a fire suppression system could meet the Safeguards Condition even if all of its nozzles pointed

away from the cooking area, so long as the system activated when there was a fire and the pipes connecting the system extended over the entire cooking area. In other words, Shot Shakers reads the Safeguards Condition to approve a wholly ineffective fire suppression system.

Reading the contested terms in context, the objective meaning of the Safeguards Condition is that Shot Shakers was required to have a complete, working fire suppression system (*i.e.*, "fully functional") that could address fires that occurred in any part of the cooking area (*i.e.*, "over the entire cooking area"). Although Shot Shakers' fire suppression system worked in the sense that it activated during the fire (*see, e.g.*, Farnham Report at 8), it was not complete because it did not have nozzles to address a fire on the broiler (*see, e.g.*, *id.* at 4).

Shot Shakers also claims that it satisfied the part of the Safeguards Condition that requires "a semi annual service contract." (*Id.* at 18.) Shot Shakers points out that AAA's reports state "Test Frequency: 6 Months," and that the invoices attached to the reports include the line item: "SEMI-ANN HOOD & DUCT CERT PER LOCAL CODES." (*See* Donovan Decl. (Dkt. # 29), Ex. 8 at 206-07, 211-12, 216-17.) USIC disputes this contention, pointing out that Mr. Simpson admitted that he only serviced his system once a year (*see* Simpson Interview at 5) and AAA's service records support only annual maintenance (*see* USIC Resp. at 14 (citing AAA 2015 Report; AAA 2016 Report; AAA 2017 Report)). Moreover, USIC points out that Shot Shakers has not produced a service contract with AAA that establishes its scheduled cleanings, let alone that those cleanings occurred on a semi-annual basis. (USIC Resp. at 14.) The court concludes that

Shot Shakers has not demonstrated an absence of disputed material fact that its fire suppression system service contract was semi-annual.

Alternatively, Shot Shakers argues that, even if it did breach the Safeguards Condition, coverage is not voided because its breach did not cause USIC "actual and substantial prejudice." (Def. Reply at 8-9.) Shot Shakers cites Mr. Iskra's and Mr. Farnham's reports that agree that a perfectly configured fire suppressions system would not have stopped the fire because of the "excessive combustible grease load presented in the appliances, hood and ductwork." (Farnham Report at 9; Iskra Report at 5.) But a prejudice analysis is only relevant in cases involving a breach of a claims handling clause. *See Pilgrim v. State Farm Fire & Cas. Ins. Co.*, 950 P.2d 479, 485, 485 n.50 (Wash. Ct. App. 1997) ("[C]ourts refuse to analyze prejudice in cases involving types of clauses other than those involving the handling of claims."). For instance, "[w]here an insured breaches a 'notice,' 'cooperation,' or 'voluntary payment' clause of an insurance policy, the insurer is not relieved of its duties under the insurance policy unless it can show that the late notice, failure to cooperate, or voluntary payment caused it 'actual and substantial prejudice.'" *Chartis Specialty Ins. Co. v. RCI/Herzog*, C11-0437JLR, 2012 WL 2389999, at *10 (W.D. Wash. June 25, 2012) (quoting *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 876 (Wash. 2008)). Here, however, the Safeguards Condition does not concern a late notice, failure to cooperate, voluntary payment, or other claims handling clause such that USIC would need to establish that Shot Shakers' alleged breach caused actual and substantial prejudice. Regardless, because of the court's

//

rulings below, the court does not need to determine whether non-compliance with the Safeguards Condition alone voids coverage.

In sum, the court concludes that the Shot Shakers has not established an absence of disputed material fact that it complied with the Safeguards Condition.

### b. *The Protective Safeguards Endorsement Exclusion*

The Safeguards Exclusion explains that USIC:

[W]ill not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**1.** Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**2.** Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

(Policy at 136.) Shot Shakers' asserts that it "do[es] not believe that United Specialty can satisfy its burden of setting forth admissible evidence showing that coverage is excluded by the above Protective Safeguard [sic] Endorsement Exclusion." (Def. MPSJ at 19.) More specifically, Shot Shakers claims that the Safeguards Exclusion is not applicable (1) under the "efficient proximate cause rule," and (2) because the fire suppression system did not have any "suspensions" or "impairments" and was in "complete working order." (*See* Def. Reply at 9-10.)

"The efficient proximate cause rule applies only when two or more perils combine in sequence to cause a loss and a *covered peril* is the predominant or efficient cause of the loss." *Vision One, LLC v. Phila. Indem. Ins. Co.*, 276 P.3d 300, 309 (Wash. 2012) (citations omitted). "In such a situation, the efficient proximate cause rule mandates

coverage, even if an excluded event appears in the chain of causation that ultimately produces the loss." *Id.* (citation omitted).  The rule establishes coverage "when a covered peril sets other causes into motion which, in an unbroken sequence, produce the result for which recovery is sought." *Id.* (internal quotations and citation omitted).  "When, however, the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application." *Kish v. Ins. Co. of N. Am.*, 883 P.2d 308, 311 (Wash. 1994) (citation omitted).  In other words, "[a]n insured may not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." *Id.* (citation omitted).

Shot Shakers asserts that either employee negligence—leaving the broiler on after closing—or the excessive grease in the hoods, ducts, and filters were the efficient proximate causes of the loss, and that both are "covered perils" under the Policy.  (Def. Resp. at 7-8; Def. Reply at 9.)  Thus, Shot Shakers argues, even if an excluded event appears in the chain of causation of the fire, Shot Shakers is entitled to coverage under the efficient proximate cause rule.

But this is not an efficient proximate cause rule case.  No matter how Shot Shakers attempts to characterize the events, there is only one cause of the loss—the fire.  *See Lesure v. Farmers Ins. Co. of Wash.*, 392 P.3d 1076, 1079-80 (Wash. Ct. App. 2016) (analyzing the efficient proximate cause rule in relation to a house fire and explaining that "[f]ire is the only cause of loss").  Moreover, the parties do not dispute that damage from a fire is covered by the Policy or that Shot Shakers' loss is the result of some

"uncovered peril." *See supra* § III.D. Rather, the cross-motions focus on whether the

Policy contains an exclusion that bars coverage for an otherwise covered loss. In short,

the efficient proximate cause rule does not apply here.

Shot Shakers also argues that the Safeguards Exclusion does not apply because the

fire suppression system did not have any "suspensions" or "impairments" and was in

"complete working order." (*See* Def. Reply at 9-10.) USIC points to out-of-circuit cases

that have dealt with similar safeguards endorsements to show that Shot Shakers' fire

suppression system violated the terms of the Safeguards Exclusion. (*See* USIC Resp. at

11-14.) The cases USIC provided are instructive. *See id.* (citing *Schwartz & Schwartz of*

*Virginia, LLC v. Certain Underwriters at Lloyd's, London Who Subscribed to Policy No.*

*NC959*, 677 F. Supp. 2d 890 (W.D. Va. 2009); *Ill. Union Ins. Co. v. Grandview Palace*

*Condos. Ass'n.*, 155 A.D.3d 459 (N.Y. App. Div. 2017); *Scottsdale Ins. Co. v.*

*Logansport Gaming, LLC*, 556 F. App'x 356 (5th Cir. 2014)).

For example, in *Schwartz*, the insurance policy at issue contained a near-identical

safeguards exclusion to our case. *Schwartz*, 677 F. Supp. 2d at 892. There, the insured

repeatedly shut off portions of its fire suppression system over the span of weeks in order

to repair a leak. *Id.* at 900. While parts of the system were shut off, a fire occurred at the

insured's property. *Id.* at 909. On these facts, the court found that the insured was not

entitled to coverage because it breached its obligation to "maintain" its fire suppression

system in "complete working order." *Id.* at 911.

Shot Shakers attempts to distinguish this case by noting that the sprinkler system

in *Schwartz* was "turned off" during the fire, which means that it was impaired or

suspended.  (Def. Resp. at 9 n.13.)  Shot Shakers argues that, contrary to the insured in *Schwartz*, because all parts of Shot Shakers' fire suppression system activated and performed during the fire, the Safeguards Exclusion does not bar coverage.  (*Id.* at 9-10.) The court disagrees.

In order to comply with the Safeguards Exclusion, Shot Shakers had to maintain the fire suppression system in complete working order.   (Policy at 136 ("maintain any protective safeguard listed in the Schedule above . . . in complete working order").)  As discussed above, Shot Shakers' fire suppression system was not "fully functional . . . over the entire cooking area" because there were no nozzles over the broiler.  *See supra* § III.D.1.a.  A fire suppression system that does not comply with the Safeguards Condition cannot be in "complete working order" for purposes of the Safeguards Exclusion.  A contrary reading would lead to an unreasonable result whereby a wholly deficient fire suppression system—such as the one the court described above with all of its nozzles pointed away from the cooking area—could comply with the Safeguards Exclusion so long as the nozzles turned on when a fire occurred.  The court does not read this absurdity into the Policy.  A deficient system is not in "complete working order."

In some ways, the deficiencies with Shot Shakers' fire suppression system are more egregious than those in *Schwartz*.  In *Schwartz*, only part of the system did not work and the insured intermittently restored the entire system to provide complete fire suppression coverage.  *Id.* at 892, 900.  Here, however, Shot Shakers' system was never in complete working order because it always lacked nozzles over the broiler.  (*See* AAA //

2015 Report; AAA 2016 Report; AAA 2017 Report; SFD Report at 12; Iskra Report at 4, 12; Farnham Report at 4.)

In sum, the court concludes that the efficient proximate cause rule does not apply and that Shot Shakers has not shown an absence of disputed material fact regarding the applicability of the Safeguards Exclusion.

Because Shot Shakers has not demonstrated an absence of disputed material fact regarding its compliance with, or the applicability of, the Safeguards Condition and the Safeguards Exclusion, the court DENIES Shot Shakers' motion for summary judgment regarding the Protective Safeguards Endorsement.

2. Concealment, Misrepresentation, or Fraud Condition

Shot Shakers also moves for summary judgment on the Concealment, Misrepresentation, or Fraud Condition, claiming simply that it "do[es] not believe that United Specialty can satisfy its burden" of proving that the Policy is void under the condition. (Def. MPSJ at 20.) For the reasons explained below, the court denies Shot Shakers summary judgment on this claim.

"Under Washington law, a clause voiding an insurance policy for the insured's material misstatement is enforceable." *Onyon v. Truck Ins. Exch.*, 859 F. Supp. 1338, 1341 (W.D. Wash. 1994) (*citing Mut. of Enumclaw Ins. Co. v. Cox*, 757 P.2d 499, 502 (Wash. 1988)). These clauses are enforced "regardless of whether the misstatements caused any prejudice to the insurance company by causing it to bear the risk of additional risk." *Onyon*, 859 F. Supp. at 1341 (citing *Cox*, 757 P.2d at 502).

According to the Policy's Concealment, Misrepresentation, or Fraud Condition:

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This Coverage Part;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this Coverage Part.

(Policy at 97.) This claim involves Shot Shakers' representations in its insurance applications. (*See, e.g.*, Def. Reply at 12.) The representations at issue are as follows:

[I]s there [an Underwriters Laboratories] approved auto extinguishing system over ALL cooking surfaces and deep fryers (other than self contained units described above)? <u>Yes</u> . . .

Is there a semi-annual (or more frequent) service contract on the automatic extinguishing system? <u>Yes</u>

Are filters cleaned at least every 6 months? <u>Yes</u>

Are hoods and ducts cleaned every 6 months or more frequently? <u>Yes</u> . . .

Are there any uncorrected fire code violations? <u>No</u>

(2014 Application at 3; 2015-17 Applications at 5, 10.) Shot Shakers argues that there is an absence of disputed material fact that the Concealment, Misrepresentation, or Fraud Condition does not void coverage because all of these representations were true. (Def. Reply at 12.)[3] The court disagrees.

//

---

[3] For purposes of Shot Shakers' motion, Shot Shakers' other arguments regarding the applicability of the Concealment, Misrepresentation, or Fraud Condition were stricken pursuant to USIC's surreply. *See supra* § III.A.1; (*see also* Def. Reply at 11-13; Surreply at 2-4.)

First, Shot Shakers has not shown that its fire suppression system was Underwriters Laboratories ("UL") approved or that it extended "over ALL cooking surfaces." (*See* 2015-17 Applications at 10.) In fact, Shot Shakers does not even represent that its system was UL approved. (*See* Def. Reply at 12.) Mr. Simpson attests that AAA never advised him that his fire extinguishing system violated any fire code—a contention that he supports with two photographs that purportedly show a 2017 white service tag from AAA, which, "based on [Mr. Simpson's] experience and understanding, means there were no issues with the fire extinguishing system." (Simpson Supp. Decl. ¶ 3.) But the photographs are largely undecipherable, and the readable portions say nothing about compliance with fire codes. (*See id.*) Moreover, Mr. Simpson admits that AAA recommended that he needed to "upgrade the fire extinguishing system." (*Id.* ¶ 4.) Mr. Simpson's account is also contradicted by AAA's 2017 Confidence Test Report that says Shot Shakers' was given a "YELLOW" tag, not a white one, and which lists numerous deficiencies with Shot Shakers' system, including that "[n]ot all appliances are protected and nozzles not right." (*See* AAA 2017 Report at 2-5.)

Regarding the second representation at issue, the court has already detailed that Shot Shakers has not shown the absence of disputed material fact that it had a "semi-annual (or more frequent) service contract" on the fire suppression system. *See supra* § III.D.1.a.

Shot Shakers has also not proven the absence of disputed material fact that its hoods, ducts, and filters were cleaned "at least every 6 months" or "every 6 months or more frequently." (*See* 2015-17 Applications at 10.) Mr. Simpson claims that he had an

agreement with Northwest Kitchen Exhaust to have the hoods, ducts, and filters "cleaned on a six month basis" (Simpson Decl. ¶ 11), but the reports from Northwest Kitchen show otherwise (*see* Nw Kitchen Reports). According to those reports, Northwest Kitchen Exhaust serviced Shot Shakers' hoods, ducts, and filters on December 3, 2014, April 2, 2015, November 12, 2015, July 28, 2016, January 19, 2017, and May 17, 2017. (*See id.*) In other words, periods in between cleanings were four months, seven months, eight months, six months, and four months. Shot Shakers had also not cleaned its hoods, ducts, and filters for almost seven months prior to the fire. Only 50% of the time, therefore, did Shot Shakers clean its hoods, ducts, and filters "at least every 6 months" or "every 6 months or more frequently." (*See* 2015-17 Applications at 10.) Shot Shakers is therefore not entitled to summary judgment that this representation is true.

Lastly, Shot Shakers has not proven an absence of disputed material fact that it had no uncorrected fire code violations. (*See* 2015-17 Applications at 10.) To support its argument, Shot Shakers points to an email from Nancy Sherman, an administrative specialist at the Seattle Fire Department. (*See* Donovan 1st Supp. Decl. (Dkt. # 34) ¶ 2, Ex. 11 ("Sherman Email"); Def. Resp. at 18.) The email was sent to Mr. Iskra in response to a public disclosure request regarding cleanings and code violations at the Property:

> The Seattle Fire Department does not publish Annual Fire Code Inspection reports. I can tell you the last inspection at this property occurred on October 4, 2016. The Seattle Fire Department does not tract [sic] hood and duct cleaning inspections. We have no records on file of the hood suppression inspection. There are no outstanding fire code violations and no complaints listed for this property.

(*Id.* at 9.)  Shot Shakers also claims that the AAA reports make no reference to any fire code violations.  (Def. Resp. at 18.)  As the court details below, Shot Shakers' account is contradicted by the evidence.

First, the email from Ms. Sherman does not establish that there are no fire code violations.  Ms. Sherman specifically states that the Seattle Fire Department does not track hood and duct cleaning inspections and that it has "no records on file of the hood suppression inspection."  (Sherman Email at 9.)  Therefore, the Fire Department would not be aware of any violations noted in AAA's or Northwest Kitchen Exhaust's reports—which are two of the key pieces evidence that USIC relies on to show that there were, in fact, code violations.  Second, the AAA reports explicitly list the fire codes and administrative rules under which it performs its inspections before marking the specific deficiencies with the Property's fire suppression system.  (*See, e.g.*, AAA 2017 Report at 3.)  Thus, Shot Shakers has not demonstrated an absence of disputed material fact that there were no uncorrected fire code violations.

Accordingly the court DENIES Shot Shakers' motion for summary judgment regarding the Concealment, Misrepresentation, or Fraud Condition.

3.  Rescission

Shot Shakers also seeks summary judgment on USIC's rescission claim.  (Def. MPSJ at 20-21.)  "Under Washington law, an insurer may rescind a policy when: (1) the policyholder represented as truthful certain information during the negotiation of the insurance contract; (2) those representations were untruthful, or misrepresentations; (3) the misrepresentations were material; and (4) the misrepresentations were made with the

intent to deceive." *Karpenski v. Am. Gen. Life Cos., LLC*, 916 F. Supp. 2d 1188, 1190 (W.D. Wash. 2012) (citation omitted). "A rescinded policy is void *ab initio*." *Id.* USIC's rescission claim is based on the same alleged misrepresentations in the insurance applications upon which it argues that the Concealment, Misrepresentation, and Fraud Condition is triggered. (*See* USIC MPSJ at 22-23.)

To defeat USIC's rescission claim, Shot Shakers relies on *Glandon v. Searle*, 412 P.2d 116, 119 (Wash. 1966), which states, "Washington law is clear that where the insurer claims the policy was never effected due to the insured's fraud or misrepresentation, then as a condition precedent to this defense, the insurer must tender back the premium" (Def. MPSJ at 20-21). Shot Shakers claims that, because USIC's has not tendered back Shot Shakers' premiums, it cannot now rescind the Policy. (*Id.*)

Washington courts have questioned *Glandon*'s wisdom. *See, e.g.*, *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 827 P.2d 1024, 1043 (Wash. Ct. App. 1992) ("More compelling is the insurers' argument, based upon rulings from other jurisdictions, that *Glandon* and *Neat* are contrary to the weight of modern authority. If this be so, it is for our state Supreme Court, and not for this court, to overrule *Glandon* and *Neat*. Pending any such eventuality, we are bound by those decisions."). However, *Glandon* is still the precedent in Washington. *See id.* USIC admits that it has not paid back Shot Shakers' premiums. (*See* USIC Reply at 6.) Therefore, according to *Glandon*, USIC is not entitled to rescind the Policy. The court thus GRANTS summary judgment in favor of Shot Shakers on USIC's rescission claim.

//

### 4. USIC's Coverage-Related Affirmative Defenses

Shot Shakers moves for summary judgment on "all of [USIC's] coverage-related affirmative defenses." (Def. MPSJ at 21.) Shot Shakers does not offer any detail on which of USIC's 20 affirmative defenses it is attacking. (*See id*; *see also* USIC Answer (Dkt. # 21) at 6-9.) The entirety of Shot Shakers' evidence and argument is that "[t]he Simpsons do not believe that [USIC] can satisfy its burden of proof with respect to any of its coverage-related affirmative defenses." (*Id.*)

A party moving for summary judgment must "identify[] each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Conclusory allegations unsupported by factual data" are not sufficient to prevail on summary judgment. *See Rivera*, 331 F.3d at 1078. Here, the court is left guessing which affirmative defenses Shot Shakers is attacking, and is provided only Shot Shakers' unsupported belief that USIC cannot carry its burden of proof at trial. Shot Shakers—the moving party on this request—has failed to comply with Rule 56's most basic requirement of identifying the defenses on which summary judgment is sought. *See* Fed. R. Civ. P. 56(a). In addition, Shot Shakers has provided only the most conclusory allegation, unsupported by any factual data. The court DENIES Shot Shakers' motion for summary judgment on all of USIC's coverage-related affirmative defenses.

### E. USIC's Motion

USIC moves for summary judgment on the same main items as Shot Shakers. (*See* USIC MPSJ at 12; Def. MPSJ at 3.) The parties present similar arguments and evidence as they did in support of and in opposition to Shot Shakers' motion for partial

summary judgment. Viewing the evidence in Shot Shakers' favor, the court concludes that there is no genuine dispute of material fact that the Protective Safeguards Endorsement and the Concealment, Misrepresentation, and Fraud Condition preclude coverage. In addition, the court concludes that USIC is not entitled to rescission for the reasons articulated above with respect to Shot Shakers' motion. *See supra* § III.D.3. Accordingly, the court GRANTS in part and DENIES in part USIC's motion for partial summary judgment.

    1. Protective Safeguards Endorsement

       *a. The Protective Safeguards Endorsement Condition*

    For the reasons articulated above with respect to Shot Shakers' motion, the court concludes that USIC has established that Shot Shakers did not comply with the Safeguards Condition. *See supra* § III.D.1.a. The objective meaning of the Safeguards Condition required Shot Shakers to have a complete, working fire suppression system that could address fires that occurred in any part of the cooking area. *Id.* It is undisputed that Shot Shakers' fire suppression system did not have nozzles that could address a fire over the broiler. *See id*; (*see also* AAA 2015 Report; AAA 2016 Report; AAA 2017 Report; SFD Report at 12; Iskra Report at 12; Farnham Report at 4; Def. Resp. at 12.)

    Separately, the court finds that, when viewing the evidence in the light most favorable to Shot Shakers, there is a genuine dispute of material fact whether Shot Shakers had a semi-annual service contract for its fire suppression system. On the one hand, the parties agree that the fire suppression system was cleaned only three times between 2015 and 2017. But the AAA reports state that the test frequency was every "6

Months.  (*See, e.g.*, AAA 2017 Report at 2.)  However, regardless of whether Shot

Shakers had a semi-annual service contract, the lack of nozzles over the broiler shows

that there is no genuine dispute of material fact that Shot Shakers' violated the

Safeguards Condition.

### b.  The Protective Safeguards Endorsement Exclusion

For the reasons articulated above with respect to Shot Shakers' motion, the court

concludes that USIC has established that Shot Shakers did not comply with the

Safeguards Exclusion.  *See supra* § III.D.1.b.  Again, there is no genuine dispute of

material fact that Shot Shakers' fire suppression system lacked nozzles covering the

broiler.  This lack of nozzles over the broiler made Shot Shakers' fire suppression system

deficient.  And in this case, a deficient system is not in "complete working order" as is

required by the Safeguards Exclusion.  *Id.*

Therefore, because Shot Shakers violated the Protective Safeguards Endorsement,

USIC does not have to "pay for loss or damage caused by or resulting from" the fire.

(*See* Policy at 136); *see also Schwartz*, 677 F. Supp. 2d at 900-02.  Accordingly, the court

GRANTS USIC's motion with respect to this claim.

### 2.  Concealment, Misrepresentation, or Fraud Condition

For the reasons articulated above with respect to Shot Shakers' motion, the court

concludes that USIC has established that Shot Shakers violated the Concealment,

Misrepresentation, and Fraud Condition.  *See supra* § III.D.2.  At least some of Shot

Shakers' representations in the insurance applications were untrue.  For example, there is

no genuine dispute of material fact that Shot Shakers did not have a fire suppression

system "over ALL cooking surfaces," that Shot Shakers did not clean its filters, hoods,

and ducts "at least every 6 months" or "every 6 months or more frequently," or that Shot

Shakers had uncorrected fire code violations. *See id.* To the contrary, Shot Shakers did

not have fire suppression nozzles over its broiler, half of the time Shot Shakers waited

more than six months between cleaning its filters, hoods, and ducts, and every AAA

report and quote informed Shot Shakers that it had uncorrected fire code violations. *Id.*

When determining if a misstatement voids an insurance policy, "[t]he key question

is whether the misstatement was material." *Onyon*, 859 F. Supp. at 1341. "While

materiality is generally a mixed question of law and fact, it may be decided as a matter of

law if reasonable minds could not differ on the question." *Id.* (internal quotations

omitted). A misrepresentation is material "if a reasonable insurance company, in

determining its course of action, would attach importance to the fact misrepresented." *Id.*

(citations omitted). In cases involving misrepresentations in an insurance application, the

insurer can only avoid liability by showing that the "false statements were knowingly

made in the application for the policy and that, in making them, the applicant had an

intent to deceive the company." *St Paul Mercury Ins. Co. v. Salovich*, 705 P.2d 812, 814

(Wash. Ct. App. 1985). That said, "if an insured knowingly makes a false statement,

courts will presume that the insured intended to deceive the insurance company." *Ki Sin*

*Kim v. Allstate Ins. Co., Inc.*, 223 P.3d 1180, 1189 (Wash. Ct. App. 2009). Once the

court finds that the insured knowingly made a false statement, "the burden shifts to the

insured to establish an honest motive or an innocent intent." *Id.* "The insured's bare

assertion that she did not intend to deceive the insurance company is not credible

evidence of good faith and, in the absence of credible evidence of good faith, the presumption warrants a finding in favor of the insurance company." *Id.*

The court concludes that "reasonable minds could not differ" that USIC attached importance to Shot Shakers' representations about its fire suppression system, how often it cleaned its filters, hoods, and ducts, and uncorrected fire code violations. *Onyon*, 859 F. Supp. at 1341. USIC argues that these misrepresentations were material. (*See* USIC MPSJ at 21-22; Dement Dep. at 144:3-148:1.) That an insurer would attach importance to these representations is self-evident, which is only underscored by the fire at issue in this case that was caused in part by excessive grease build up, and which was not addressed by a fully functional fire suppression system that complied with the fire code.

The court then must determine whether there is a genuine dispute that Shot Shakers knowingly made these false representations with the intent to deceive USIC. *Salovich*, 705 P.2d at 814. First, Mr. Simpson implies that Shot Shakers did not know about any representations in its applications because he "never personally filled out any application for insurance on behalf of Shot Shakers." (Simpson Supp. Decl. ¶ 2.) This "uncorroborated and self-serving" testimony does not create a genuine dispute of material fact. *See Villiarimo*, 281 F.3d at 1061. Either Mr. Simpson or Ms. Simpson signed all of the applications. (*See* 2014 Application at 6; 2015-17 Applications at 3, 8, 13.) Directly above the signature line on each application, the applications explain that a signature "warrants that the above information . . . is true, complete, and free of material misstatement or misrepresentation.") Mr. Simpson's allegation is therefore contradicted

//

by the record and does not create a genuine dispute regarding whether Shot Shakers knew about the representations in the applications. *Villiarimo*, 281 F.3d at 1061.

Second, at least with respect to the fire suppression system and the uncorrected fire code violations, there is no genuine dispute that Shot Shakers knowingly made false representations. Shot Shakers knew from the three AAA inspections and the two AAA quotes that its fire suppression system was not "over ALL cooking surfaces" and that its system needed repairs in order to comply with "manufacture [sic], state and local codes." (*See, e.g.*, 2016 Quote at 2.) Mr. Simpson even admitted to Mr. Iskra that "he knew the radiant broiler did not have fire suppression protection as documented on inspection reports from AAA Fire Protection Company." (Iskra Report at 4.)

In addition, each AAA report listed the codes and rules under which the inspections were being performed. (*See, e.g.*, AAA 2017 Report at 3 ("Refer to **2009 Seattle Fire Code (SFC) Sec. 202, 602, 609, 904.11-904.11.6.3; SFC Administrative Rule 9.02.09; and 2002 NFPA 17, 2002 NFPA 17A, and 2008 NFPA 96** for inspecting and testing requirements.").) After listing these codes and rules, each report marked the specific deficiencies with the Shot Shakers' fire suppression system. (*See, e.g.*, *id.*) For example, all three reports noted that Shot Shakers' cooking appliances did not have the required number and type of nozzles to provide adequate fire protection, and that the nozzles are not properly positioned. (*See* AAA 2015 Report at 3; AAA 2016 Report at 3; AAA 2017 Report at 3.) The reports further specified that the "nozzles don't line up and aren't correct," that the "[n]ozzles [are] not within specs," and that "[n]ot all appliances are protected and nozzles not right." (AAA 2015 Report at 5; AAA 2016 Report at 5;

AAA 2017 Report at 5.)  The AAA quotes likewise informed Shot Shakers that its

suppression system was not over all of the cooking area.  (2016 Quote at 2 ("[n]ot all

appliances are protected and nozzles not correct."); 2017 Quote at 2 ("appliances have

been added to cook line and have **NO** or **WRONG** surface protection.").)

Shot Shakers claims that it believed its fire suppression system was over the

cooking area even if actual extinguishing nozzles were not.  (*See* Def. Resp. at 16;

Simpson Decl. ¶ 9.)  But as explained above, this is not a reasonable interpretation of

what it means to have a fire suppression system over "over ALL cooking surfaces."  *See*

*supra* § III.D.1.  And again, Mr. Simpson admitted to Mr. Iskra that "he knew the radiant

broiler did not have fire suppression protection."  (Iskra Report at 4.)  Shot Shakers also

says that Ms. Sherman's email, on behalf of the Seattle Fire Department, confirms that it

did not have any uncorrected fire code violations.  (Def. Resp. at 18; Sherman Email at

9.)  But as discussed, Ms. Sherman's email specifically states that the Fire Department

did not have any records of fire suppression system inspections or any violations listed

therein.  (Sherman Email at 9.)  Shot Shakers, however, would have been keenly aware of

the violations in AAA's reports and quotes as Shot Shakers' was the recipient.

Moreover, Ms. Sherman's email was sent in January 2018, well after Shot Shakers made

the misrepresentations in its insurance applications.  (*See id.* at 8.)  In other words, Shot

Shakers could not have relied on Ms. Sherman's email when filling out its applications.

Because Shot Shakers knowingly made misrepresentations about its fire

suppression system and uncorrected fire code violations, the court presumes that Shot

Shakers intended to deceive USIC, and the burden shifts to Shot Shakers to establish an

"honest motive or innocent intent." *Kim*, 223 P.3d at 1189. Shot Shakers has not

provided any evidence of an honest motive or innocent intent. (*See generally* Def. Resp.)

The most Shot Shakers provides is its belief that it did not need fire suppression nozzles

over all of the cooking area and that the AAA reports "make <u>no</u> reference to any state or

local code violations." (*Id.* at 16, 18.) Again, these claims are contradicted by the Policy,

as well as years' worth of AAA inspections and quotes that listed the state and local code

violations, told Shot Shakers that its system was deficient, and informed Shot Shakers

that repairs are "required by the manufacture [sic], state and local codes." (*See, e.g.*,

2016 Quote at 2; AAA 2017 Report at 3.) Even when weighing the evidence in the light

most favorable to Shot Shakers, its bare assertions of innocent intent are not enough to

overcome the presumption that it intended to deceive USIC. *Kim*, 223 P.3d at 1189.

In sum, the court concludes that there is no genuine dispute of material fact that

Shot Shakers violated the Concealment, Misrepresentation, and Fraud Condition. The

court also concludes that, as a matter of law, Shot Shakers' violation of this Condition

voids coverage under the Policy. The court therefore GRANTS USIC summary

judgment on this claim.

### 3. Rescission

For the reasons articulated above with respect to Shot Shakers' motion, the court

concludes that USIC is not entitled to rescission as a matter of law. *See supra* § III.D.3.

USIC does not dispute that it has not tendered Shot Shakers its premiums, and this is a

prerequisite to achieve rescission of an insurance contract. *See Glandon*, 412 P.2d at 119.

The court therefore DENIES USIC's motion on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part USIC's motion to strike (Dkt. # 42), GRANTS in part and DENIES in part Shot Shakers' motion for partial summary judgment (Dkt. # 27), and GRANTS in part and DENIES in part USIC's motion for partial summary judgment (Dkt. # 24).  The court also ORDERS the parties to file a joint status report within 14 days of the date of this order identifying any claims remaining for trial in light of the court's rulings on the cross-motions for summary judgment.

Dated this 15th day of January, 2019.

JAMES L. ROBART
United States District Judge